That's 24-3174, Raymond v. United States of America. That is taken on submission and we take it under advisement. That leaves us with one motion to be argued before this. Now to judge panel, Genius Group v. LZG International, 25-630, and Mr. Basile, I scheduled you first so that you wouldn't have to wait for those other motions, but here we are. You have five minutes per side and you may proceed when you're ready. Good morning, Your Honor. May it please the Court, my name is Warren Basile, I'm the Basile Law Firm PC. We represent the petitioner appellant, Genius Group. We're here today, and I have another apology to the Court regarding the stylistic of the actual motion. The underlying appeal is to vacate the Polari injunction. This motion is for purposes of staining enforcement of the PI pending the appeal. Although stylistically from the caption and the title, it may have created some confusion. You sought an administrative stay and then vacater of the PI, and so I suppose the question is whether the administrative stay has been denied, whether you have a pending motion to stay before the panel. That's correct. And notwithstanding the stylistic error of the motion, the motion isn't a stay and joining the Polari injunction for basically two reasons. But let me ask just an administrative question. So the administrative stay was denied, but offered reconsideration if a certain bond were not filed. My understanding is that a bond was filed, is that right? Yes, there was two bonds that were filed. Both were defective. About a week and a half, two weeks later, the respondents in that matter, the lower court, did file a non-defective bond. And what is the status of the arbitration proceeding? Well, they're just about to authorize the actual arbitration. It took this long. We expect that to happen this week, and she will take over the process with regard to the ICC arbitration. There has been some movement in the arbitration. Administrative claims were filed. Counterclaims have been filed. Responses to counterclaims, they're required to do soon, but we believe that will be in the hands fully of the arbitrator once she's in panel. So do you have any sense about what the schedule will be overall, whether there's a number of arbitration days or what have you? We don't know. I'm hoping within the next 10 days, she is in panel. Both parties have agreed to the arbitrator. All the paperwork is within. I believe she's accepted the appointment. It just has to be finalized by the ICC. But past that, we don't know, but of course it's arbitration, okay. Thank you. We're here because of basically two issues. The factual claims that were brought up in support of the preliminary injunction sought by the respondents' attellies were demonstrably false to the court, and the lower court did not consider the harms of the preliminary injunction to my client. Now, your honors, for a little bit of background, which I think has to be understood, we first commenced under the CPLR, an aid in arbitration petition at the district court. That was assigned to Judge Phaler. Judge Phaler also had a confidential statement of claims that we found in the arbitration that was sealed because Genius Group is a public company in the New York Stock Exchange in trading that wasn't public information with regard to the particulars of the dispute. But she reviewed the particulars of the dispute. And what we asked for was for her to maintain the status quo because shares based upon this transaction were already issued to the respondent. Those shares were sitting at the transfer agent. To make matters more complicated, a shareholder group that we refer to as the LZGI shareholders intervened in the initial petition action with Judge Phaler who allowed them to intervene. But Judge Phaler issued the TRO for the purposes of not changing ownership or the rights to the shares of stock, whoever they were entitled to, whether it's the LZGI Corporation or the LZGI shareholders. It was just to pause any distribution of those shares pending result in the arbitration. And again, just excuse me for interrupting, but so Genius is publicly traded and LZG is not. I believe LZG is publicly traded. You're both publicly traded. Location from Sheets Service where our point is on the New York Stock Exchange. Okay, thank you. So during this, and this was all prolongated because of a transaction, which I don't think we need to go into on the record of how we meet the transaction itself, but there were disputes that had risen under the transaction. And it came to a head in October when the respondents served our client with a notice of rescission. The only thing we couldn't resolve is how my client was gonna get paid back the $6.6 million if they're ready to pay towards the asset. There was negotiations going back and forth. At the time we applied for the TRO and got the TRO, those discussions continued. Eventually those discussions broke down three and a half months later when the respondents filed their own petition in need of arbitration seeking a very comprehensive preliminary injunction, which basically they asked the court, we want to prevent this New York Stock Exchange company from being able to issue any shares whatsoever. And we don't like their Bitcoin treasury strategy that they decided to give us. I know this is very complicated with a lot of nuanced issues, but the fact is, in their petition, they mischaracterized to the court the entire Bitcoin strategy. It seemed that the court, the lower court, thought this was changing the company's business model. It wasn't. It was just a board of directors resolution to engage in a Bitcoin treasury strategy. In other words, instead of- So part of it, I mean, again, sorry to interrupt but because our time is somewhat limited, your opposition argues that you've made this, gone ahead with or without their votes to engage in this Bitcoin strategy, and yet you're now crying poverty in the bankruptcies around the corner while you still have all these Bitcoin treasury assets. Why is that wrong? That argument could have held water two and a half months ago, but it doesn't right now. The company was forced to, first of all, 80% of that Bitcoin reserve was security for other loans the company has taken for operations. The rest of the Bitcoin has now been, for the most part, liquidated in order to pay for the operating expenses, employee salaries, office leases, software, because by preventing our client from issuing shares under at-the-market offering that the respondents voted for last summer when they were in the position of having a board representative on our board and as well as a Chief Revenue Officer position for Mr. Ritz, the client no longer had that since Valentine's Day. So this also confuses me. It sounded to me as though you were saying that the inability to issue shares was kind of interfering with your main business model, that issuing shares was how you derive income. What's the essence of the company? What does the company do? Oh, the company is a global AI education company. So you have a product. Oh, we have a product. We're in 20 countries. So don't you have income from sales of the product? Well, the sales are slow. AI is catching on. People are using it as applied in education. It's not a mainstream yet technology used for education because as your honors are aware, sometimes lawyers use AI and they create cases out of thin air. So you're saying right now it's just issuing stock and continue to try to grow the company in these ways. And so you were in a more vulnerable position than LCG because the district court thought it was evening out the status quo by imposing obligations on both sides, right? Yes, that's 100% correct. And so what was incorrect about what it did? I mean, you're saying that you suffered, your company suffered a greater harm in fact than your opponent, than LCG. From what similarly was looking parallel restrictions. Yes, because the only thing LCG was deprived of was the 7 million shares of stock held at the transfer agent. Is there something the district court could have done to meet the goal of evening out the harm and burden in the interim? Short of what she did? May have, I think the judge got- What would that have been? I really, well, I think they would have done is, they would have, if she reviewed the record and she looked at it with a 20,000 per view, she would have seen that the LCG representatives that were sitting on the board of directors and as an executive officer of the company already consented to this ATM. They knew that dilution was going to come and would affect their shareholders if they were to- But you had a chance, right? To present those arguments about the district court's misconceptions to her, right? Yes. And sought a stay as well as sought reconsideration, I think. Yes, and we did, but I really believe, and I've been practicing law for 35 years, I really believe that the judge had fatigue because she had a lot of intervening motion practice by a third party, which we call the LZT shareholders, because before we filed our arbitration, the LGZ shareholders sued the respondents in a class action in the Southern District that was assigned to this particular judge. And that's why our petition was assigned to Judge Paley, because they were basically unrelated at the time. This case was then transferred back to Judge Viscoso, who wanted to address these issues because she thought it would tie in with the class action, even though one is a petition in native arbitration and the other was a class action. She probably thought that there was some sort of crossover of facts and things that made- Understandably. Yeah, and I don't think that was imprudent. I think that was possibly a good call on her part. But because the LZG shareholders have intervened, they made motions to consolidate, this should have been a very easy, simple aid and arbitration to maintain the status quo. What I think got lost here is what was the status quo and when was the status quo? And how do you balance it at the status quo? We had thought- But so, okay, so even fatigued district judges need assistance from sophisticated counsel. And so one question such a judge might ask is the one I've asked you that you've not answered, which is, well, what would be a better balance? What would be some fair or appropriate interim TRO or PI that would balance out the burden on LZG? What's the answer to that? Well, I think the answer was found in the original PI that the parties had originally stipulated to. Because the concern of both the respondents and the petitioner in the lower court was the attempted access by the LZG shareholders to get the stock. It wasn't LZGI demanding that the stock be issued. It was their shareholders who had been frustrated for whatever reason with LZGI corporate. So I think by, now maybe she could have fashionably said, give them back their voting rights. And on top of that, they have never offered to replace the board member that resigned from the board, Mr. Moe. So it's not like we prevented them from participating in the company up until we had to file the arbitration. So it would be at that point, that would be where the status quo would start. Because the parties were trying to work out a settlement. They agreed to rescind the transaction. Both parties agreed. We would start with a notice of rescission. And three months later, when we couldn't resolve this in a settlement, they decided to, for the first time, raise all these other claims. But the key issue for your client is getting back the $6.5 million that was paid out on the assets? In the arbitration, we rescinded the agreement. It would be up to the arbitrator to determine how much gets returned and in what fashion. Now, the papers demonstrate that we came up with a solution for that that seemed agreeable until they added more that they wanted out of the transaction, to rescind the transaction. And I don't wanna misspeak because of non-public information but it is in the record of what they were asking for. And that's why the board eventually said, no, we can't rescind it under your terms. We have to go to arbitration. All right, thank you. Sorry, one more thing. You can finish. Yes, thank you. I think that what could have been resolved is they had an open invitation and Megan Lowe, a court judge, would have said, you guys, in response, appoint somebody to their board so you have representation according to this until the arbitrator decides. You'll get your voting rights back, which, by default under this new P.I. that she posted, gave them back their voting rights inadvertently. So the only thing, the shares of stock that are sitting in the transaction. And if your arbiters are inclined to grant a stay pending the appeal, that would also affect our client because the state would prevent the enforcement, which means that the transfer agent could then transfer the shares. My client at this point, having lost over $26.5 million, $2.5 million a week, since February 14th, views that cost to them as insignificant compared to the opportunities and the exodus of some employees and they have $4 million of accounts payable that they just can't pay.  All right, thank you, counsel. Thank you, Your Honor. We'll hear from Mr. Miller. You almost had a full courtroom for your argument, Mr. Miller. Yes, Your Honor. The last time I was in front of the Second Circuit, the same thing happened. We were at the end of the calendar and everybody laughed when the room was empty. So I'm used to it. Good morning. I'm Brian Miller from King & Spalding on behalf of the LZG parties. I want to focus on three key points this morning. First is that it would be overbroad and I understand now that Genius is not even seeking to vacate the entire injunction for this court to do that on a Rule 8 motion stay. The initial brief was very confusing. It's now been clarified this morning and, Your Honor, I'm sorry, Your Honor is absolutely correct. The court already denied the administrative stay. So I think that really should be the end of the hearing. You think the argument they're making now for a stay pending appeal is forfeited and not before us or how do you see it? It's already been ruled upon. So I don't think it's forfeited. I think it was ruled upon in the papers before it was. Right, they could have moved for an administrative stay. I mean, often we get an administrative stay that would get it to the panel like now and then the panel would decide the motion for stay pending appeal, which is what I understand them to be arguing we should construe the papers as. I'm happy to address all the points. My point is I think it's already been ruled upon, but obviously I want to address the merits. So I'm sorry, I'm confused. I thought the administrative judge, the single judge denied administrative stay and referred it to a motions panel fully constituted. And so all those issues were preserved. As to the vacatur of the entire injunction, not as it's said, it's how I read the administrative order. Okay. And it would be overwrought for this court to throw out the entire injunction and vacate it on a ruling motion. Instead, I think the court should be looking at it as a stay motion now. It's a stay, yes, but not the vacatur of the whole thing. Correct, as to whether the standard is satisfied per se. Okay, okay. So referring to the merits of that, the second point I want to make is that the district court was correct to grant the injunctions that are reciprocal in order to preserve the status quo pending arbitration. In the April 2nd hearing at page 15, the court said, I'm not going to have one side with their hands tied while you go to arbitrate and the other side free to do whatever it wants. Very simply, that's all the court did here is under the Blumenthal and LaRoche authorities from the Second Circuit, entered injunctions to preserve the status quo that existed prior to the arbitration commenced on both sides. The arbitration commenced on October. I'm sorry, and the status quo, I guess your opponent suggests that we have some confusion about which status quo should be preserved. So what's your view about that? I think the court completely understood the status quo to be preserved and that's prior to the arbitration being commenced. The arbitration was commenced on October 30th of 2024. One week later, Genius went to the Southern District of New York seeking an injunction to preserve the status quo pending arbitration. And then it was another week after that, on November 12th of 2024, when Genius announced that it was switching to the new Bitcoin first strategy that they called it. So the Bitcoin strategy did not exist prior to the arbitration being commenced. We are seeking to preserve the status quo, which is that we entered into a transaction with Genius to get shares as the company that they represented was an education tech company, not a Bitcoin investing company. And that was prior to the arbitration. And they claimed that you made representations also that proved to be untrue. Both sides alleged misrepresentations against each other. That is correct. And that is what the arbitrator will decide. So thinking about balance of harms, I mean, we've got a picture from Genius Group as to what is happening and will happen to them under the stay, under the preliminary injunction. Tell us what happens to LZG if that injunction is stayed pending appeal. LZG owns about 7.3 million shares in Genius, which it believes it received as part of a misrepresentation based on the nature of their business. Where Genius represented, it was in this education technology business, making significant amount of monies that are set forth in the sealed filings. None of that was true. So- So you haven't answered the question yet. What happens? To LZG. What happens to LZG if there's a stay pending appeal? That gets to those merits questions. We are stuck. LZG is stuck holding the shares and cannot sell them or do anything with them pending the arbitration. And what does that mean? LZG goes into insolvency, loses employees? What happens? If Genius is permitted to continue with its new strategy of investing in Bitcoin and deteriorate the company and change their business model from being an education tech company, while LZG cannot do anything with those shares, can't sell them because it's enjoined from doing so, it would be forced to ride those shares down to the bottom based on misrepresentations and a change in business that is a change in the status quo compared to what Genius was doing prior to the arbitration. So that's the harm that LZG- Is that irreparable? That would be irreparable. And I think it's because the relief that LZG is seeking in the arbitration is really the flip side of the relief that Genius is seeking, which is Genius wants to unwind the transaction. LZG is stuck in this transaction and wants to unwind it and get compensated. If it cannot sell its shares in the meantime and is stuck holding them when the business is going down the tubes on the Genius side, then LZG would suffer irreparable harm during the arbitration. And the case law makes clear that- Sorry, why is it irreparable? Yeah, I guess you're about to get to that because it sounds like it would be compensated by money. The case law is clear, and this is what the district court looked at, that when you're looking at an injunction to preserve the status quo pending arbitration, the irreparable harm is from changing the status quo pre-commencement of the arbitration. There also is the substantial questions doctrine that the Second Circuit has laid out that the district court relied upon in order to establish the irreparable harm element for the injunction, too. But it looks like the party's dealings, I mean, status has not been quo at any point since September or even last August, maybe. It's been a very rapidly changing picture. Genius keeps trying to change the picture, and the injunction would prevent them from doing that so that we can get to the arbitration and arbitrate and hopefully get a claim for damages against the company that existed before the injunction. So I suppose they would say, I suppose they would say that they also made some discoveries that they hadn't really anticipated about certain assets. So, I mean, that's, yeah. Same with LZG. Right. And those are the claims, and that's why the court looked at the substantial questions issues, because both sides are contending misrepresentations against each other. And the court correctly said, the right thing to do under the case law is preserve the status quo pending arbitration. If I could, Your Honor, I wanted to briefly address the third point, which is that Genius hasn't carried their burden to meet the standard for a stay here. And I really just want to focus on a couple of things. There is a lot of information that's put forth in the declarations that Genius filed. Most of it's very confusing to us, and it may be confusing to the court too, but the court could focus on two key things which really highlight that they haven't met the burden to say that this injunction is putting them out of business or unable to do things. It's undisputed that Genius has $41 million worth of Bitcoin that it owns. That was the price as of yesterday. Their argument is that they have to be able to raise more stock in order to continue the business. Well, excuse me, I think as to the Bitcoin, I think we just heard that that is pledged as collateral for certain assets. That's what they're claiming now, Your Honor, and that's the first point I'd like to make on this. If you look at, I'm reading this, it's on camera, if you look at the second affidavit of Mr. Hamilton, which was paragraph seven, filed with this court, that's where Genius contends it can't use the Bitcoin. Contrast that, however, with an earlier affidavit from the same gentleman that was filed in the district court at docket 74-1, paragraphs four through 11, where the same man said that injunction should not be granted because Genius owns millions of dollars of Bitcoin that can be used to satisfy a judgment in the arbitration. So which is it? These are completely contradictory points about whether the Bitcoin is encumbered or not. So in the face of that contradiction, they haven't met a burden to justify a say. The second discrepancy and last discrepancy I'd like to point out is similar, is that in that new affidavit, Mr. Hamilton says in paragraph six that they have a certain amount of expense every month that they need to be able to sell shares in order to pay rather than the alleged education business. But if you look at his declaration at docket entry 67-1 in the district court, paragraph 28, he said that the expenses the company were experiencing was eight times higher than that. So this is just two examples of the inconsistencies that when the court really scrutinizes the record, they haven't really established enough here to meet their burden to establish a reputable arm and justify a stay. All right. Thank you. Thank you, counsel. The motion is submitted and we will take it under-